**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GREG HOLLAND, | 18 Civ. 6697 (KMK) |
| Plaintiff, | |
| v. | |
| THOMAS MATOS, NANCI MATOS and BESTLIFE GIFTS LLC, | |
| Defendants. | |

**DIRECT TESTIMONY OF GREG HOLLAND**

I, Greg Holland, declare:

1.  I am the Plaintiff in this action and a citizen of Canada currently residing in Victoria, British Columbia.

**A.  Personal Background**

2.  I was raised in Alberta, Canada. Upon graduating high school in 1988, I began working part-time as a bookkeeper and full-time as a "pioneer" (i.e., an evangelizer) for my local congregation of Jehovah's Witnesses ("JW"). After several years, I was encouraged to relocate to Ecuador to continue my pioneering. At age 22, I sold my Honda Accord for CAD $6,000 and rented an apartment in a very rural part of Ecuador for $20 a month. I spent the next five years living off my $6,000 in savings while preaching to the local community. Eventually, I and a few other local JW pioneers were able to generate enough interest to start a congregation.

3.  By 1999, I had run out of money, so I returned to British Columbia and took a temping job at a local government agency. At around the same time, I began dating my now-wife, Jade Holland, who I met in Ecuador. After saving some money working for about a year, I returned

to Ecuador, where Jade and I married on March 5, 2000. We got an apartment in Quito and affiliated with a large congregation there to continue pioneering.

### B. Founding of Ministry Ideaz

4. Needing more money to support ourselves, I changed my visa to allow me to work in Ecuador and studied website design. In 2002, I contracted with a local artisan who produced beautiful handcrafted leather bible covers and started selling them on eBay. Jade and I named our business "Ministry Ideaz," which we established as a sole proprietorship. As customer interest grew, we created our own Ministry Ideaz website for online sales. We had our first sale two weeks after our website went live. Business remained very slow for several years, but gradually increased to where Jade and I could earn a living. Jade and I each devoted around 40 hours a week to our business (which was in addition to our full-time service as pioneers), and the two of us had sole responsibility for all aspects of the business, from customer service to marketing to packaging and shipping.

5. Jade and I were the only employees until around 2005, when we hired a part-time employee to field customers' phone calls and another part-time employee to help with packaging and shipping.

6. Around 2013, the Jehovah's Witnesses published a new translation of the bible to replace the version they had been using since 1960. This fueled a surge in demand for leather bible covers, and our business grew exponentially. We had to hire five employees to take customers' orders, and seven employees to help with shipping.

7. In 2014, Jade and I had our first child, and in 2015, we had our second. As a result, Jade stepped back from the business while I continued working full-time.

8. With the exponential growth of our business, we began investing substantial amounts in marketing efforts. From 2008 through 2017, Ministry Ideaz spent an average of $25,000 per month on marketing, such as pay-per-click ads and email advertisements. By 2017, Ministry Ideaz had accumulated a highly valuable customer database with information about more than 200,000 customers.

9. Today, Ministry Ideaz manufactures and sells a variety of religious-themed goods to the worldwide community of Jehovah's Witnesses, principally through its website, www.ministryideaz.com.

C. **Opening the Pine Bush Store**

10. Over the years, I had a number of customers express interest in a Ministry Ideaz "brick and mortar" store where they could browse our products. After the Jehovah's Witnesses relocated its headquarters from Brooklyn to Warwick, New York at the end of 2016, I began looking into opening a store near the new headquarters.

11. In April 2017, I asked a friend, Katherine Moeckel, to recommend someone in the Warwick area who could help me open a Ministry Ideaz store. I had met Ms. Moeckel when I first moved to Ecuador, but by 2017 she had moved to Texas and was working with me to process returns from our U.S. customers.

12. Ms. Moeckel put me in touch with defendants Thomas and Nanci Matos, a married couple living in Pine Bush, New York. Ms. Moeckel told me that she had met the Matoses in the late 1990s when they were all members of the same JW congregation in Kansas. The Matoses were volunteering at the JW headquarters in Warwick, but lacked regular employment.

13. The Matoses and I began speaking and texting in late April 2017. Exhibits 2, 3 and 4 are true and correct copies of iMessage text messages between me and Nanci Matos and Tom

Matos. I trusted the Matoses because they had known Ms. Moeckel for nearly 20 years and they were part of the same Jehovah's Witnesses church and community.

14. The Matoses requested and I agreed to pay them each $25 an hour to set up a storefront, including finding a location, forming a legal entity, hiring an accountant, opening bank accounts, and building out and operating the store. We also agreed that I would be the sole owner and that the Matoses would be employees. As a Canadian citizen living in Ecuador, I was unfamiliar with U.S. law and I relied on the Matoses for everything related to the launch of the New York store.

15. The Matoses scouted commercial spaces and we ultimately settled on a retail space in Valley Supreme Plaza in Pine Bush, New York. Tom signed the lease as "Thomas Matos dba Ministry Ideaz" (Ex. 5) and told me that the lease belonged to the forthcoming "New York Ministry Ideaz LLC," which we would establish.

16. Tom selected a local attorney to assist with forming an LLC and setting up the business. I paid all the associated legal fees and expenses. Tom told me that the attorney had advised that because I was not a U.S. citizen or resident, I could not be the sole member of the LLC or open a U.S. bank account for the business. Ex. 4 at Holland0002489-91. As a result, Tom proposed that he and Nanci become members of the LLC with a 10% interest, but with the understanding that, as Tom put it, "[t]he split of 90% to 10% [was] strictly for the sake of the company name!," and that their salaries would be their only compensation. *Id*.

17. The Matoses then sent me an Operating Agreement that the attorney had prepared. Ex. 9. I signed and returned it to Tom. Ex. 10. Tom signed the Articles of Incorporation as the LLC Organizer. Ex. 42. The legal name of the newly-formed entity was "Ministry Ideaz LLC."

4

I will refer to this entity as "the LLC," to distinguish it from the Ministry Ideaz (Ecuador) online store that I was simultaneously operating as a sole proprietorship in Ecuador.

18. Based on the following language in the Operating Agreement and my discussions with the Matoses, I understood that the Matoses were responsible for the day-to-day management and operations of the store, and for maintaining its books and records at their home in Pine Bush.

> 3. The general management of the Company and the day-to-day operation shall be under the direction of THOMAS MATOS and NANCI MATOS,
>
> 4. The books and records of the Company shall be maintained by THOMAS MATOS and NANCI MATOS at 23 Sunset Trail, Pine Bush, New York 12566. All

Ex. 10.

19. The Matoses did not contribute any money to the LLC. I contributed all funds needed to form the entity and establish the storefront.

20. From May 5, 2017, through June 22, 2017, I wired $57,162.64 to the Matoses for expenses to open the store, including hiring an attorney and building out the leased space. Additionally, from May 2017 through February 2018, I purchased or shipped inventory valued at $207,911.04 to stock the New York store, infused an additional $52,400 in cash, and paid at least $36,653.43 to cover various Ministry Ideaz expenses. Thus, in total, I personally contributed at least $354,127.14 in cash and inventory to the LLC.

21. To calculate these amounts, I relied on the following documents:

   a. Ex. 108, which is a true and correct copy of banking records reflecting wire transfers from my personal bank account to the Matoses for the LLC's formation and operation;

      b. Ex. 109, which is a true and correct copy of account statements for my personal PayPal and bank accounts, which reflect transfers I made to the LLC's bank account;

      c. Ex. 110, which is a true and correct copy of banking records reflecting wire transfers that I made to purchase inventory for drop shipping to the LLC;

      d. Ex. 111, which is a true and correct copy of invoices and receipts for inventory purchases reflected in Ex. 110;

      e. Ex. 112, which is a true and correct copy of account statements for my personal PayPal account, which reflects payments to cover inventory and administrative expenses on behalf of the LLC;

      f. Ex. 113, which is a true and correct copy of records reflecting LLC inventory and administrative expenses that I paid with my personal debit card linked to my PayPal account; and

      g. Ex. 114, which is a true and correct copies of shipping manifests for inventory that I shipped from Ministry Ideaz' warehouse in Ecuador to the LLC's store in Pine Bush.

22. In their Proposed Findings of Fact, the Matoses refer several times to my needing money to pay credit card and other debt. This was all business debt resulting from the massive amounts of money I was pouring into the LLC.

23. At the same time we were working together on the store, the Matoses also became very close personally with me, my wife and our two children. My family stayed at the Matoses' home during an extended visit to Pine Bush in August and September 2017. They gave many gifts to our children, and showered us with hugs, laughter and affection. My wife and I came to think

of the Matoses as surrogate parents and grandparents to our children, and the Matoses often referred to themselves as such. Our three-year-old son started to call them "Grampa Tom" and "Granma Nanci." We were in touch with them every single day, constantly exchanging jokes.

### D. The Matoses' Management of the Pine Bush Store

24. On July 3, 2017, the Ministry Ideaz store opened to the public. As agreed, the Matoses ran the store's day-to-day operations, including receiving inventory shipments, tagging items, stocking shelves, paying ordinary business expenses, maintaining bank accounts, and keeping the company's books and records.

25. Equally important, the Matoses were also responsible for assisting with online orders that U.S. customers placed with Ministry Ideaz (Ecuador). Because of logistical difficulties shipping directly from Ecuador to customers in the U.S., it was much more efficient to route orders through the store in Pine Bush. Thus, all orders destined for the U.S. were individually packaged in Ecuador, and pre-labeled with USPS postage using the stamps.com service. These packages were then consolidated into large 100-pound boxes for delivery to Pine Bush. After arriving in Pine Bush, it was simply a matter of Tom or Nanci opening the large box and dropping off the individual packages at the Pine Bush post office.

26. At my direction, the Matoses opened an account on behalf of Ministry Ideaz at TD Bank. Ex. 12 are true and correct copies of statements for the Ministry Ideaz LLC bank account (ending in 0847) that I downloaded from TD Bank's website.

27. The store's sales were processed using Clover, an all-inclusive POS system that processes sales and credit cards payments, and tags, tracks and monitors inventory.[1] The Clover system was directly linked to the LLC's account at TD Bank. I sent a senior employee of Ministry

---

[1]   See www.clover.com.

Ideaz (Ecuador) to New York for a week to teach the Matoses how to use the Clover system and implement the sales procedures that I had established with the Matoses.

28. The store had a cash register consisting of a tablet computer with an attached credit card reader and scanning gun. To make a purchase, customers would bring merchandise to the register, where the Matoses would scan the product's code using the scan gun linked to the Clover inventory system. Credit or debit card payments were made through the card reader connected to the tablet. Cash payments were placed in a bank envelope or drawer located below the counter. All sales were to be run through Clover.

29. Although the Matoses hired various employees (usually recruited from the local JW congregation) to help with the store at times, they assured me that at least one of the Matoses was always present and responsible for overseeing the business.

30. The store was an instant success. From July 2017 through October 2017 alone, the revenues totaled at least $289,901, or an average of over $72,000 per month. During the nine months of its existence, total revenue was $415,307.36. These figures are derived from Exhibits 11, 13, 18-20, and 125-198, which are true and correct copies of the records I obtained from the LLC's Clover account, including detailed monthly statements of every retail transaction.

31. The Matoses were responsible for depositing cash receipts into the LLC's TD Bank account. During the nine months the store was open, Clover recorded at least $104,253.98 in cash sales. However, the Matoses deposited only $34,598.59 in cash sales proceeds. *See* Ex. 132, 135, 141, 148, 161, 168, 169 and 176. Despite my requests, the Matoses have never accounted for the remaining $69,654.49 in cash sales.

32. I understand that on November 2, 2017, the Matoses opened an account for the LLC at Walden Bank (account ending in 8291). Ex. 219 at Walden000031-32. I also learned that on

December 21, 2017, the Matoses opened a second LLC bank account at Walden (ending in 9260). Ex. 219 at Walden000708. According to the Walden account statements, the Matoses deposited at least $42,388.37 in cash, checks or wires—specifically, $40,923.94 into the account ending in 8291, and $1,464.43 into the account ending in 9260. The Matoses never gave me access to these accounts, and eventually closed the accounts without notifying me or accounting for those funds.

33. While the store was open, the Matoses would regularly tell me they needed funds to cover operating expenses or taxes. In response, I frequently wired money to the Matoses, even though they did not always provide me records of their spending. In fact, throughout our relationship, I repeatedly asked the Matoses for an accounting of their spending, including basic documents such as receipts and online access to the company's bank account. The Matoses repeatedly demurred and delayed and ultimately never provided the information I requested.

34. During their deposition testimony, the Matoses claimed that I expressly authorized every transfer, withdrawal or payment or use of LLC funds. This is false. In fact, I pleaded with them repeatedly to explain their spending to me. The situation ultimately came to a head in November 2017.

35. On November 27, 20217, I was hospitalized in a coma for several days in Ecuador, following a drug overdose during an extramarital affair. The Matoses capitalized on the extreme stress this placed on me and my family.

36. *First*, the Matoses began transferring funds from the Ministry Ideaz TD account to their personal accounts without my knowledge or authorization.

37. On November 28, 29, and 30, 2017, while I was in a coma and obviously incapable of authorizing any transfers, the Matoses transferred $10,220.32 from the LLC's TD Bank account into their personal bank accounts. Ex. 12 at Holland0001136.

38.     On December 12, 2017, the Matoses transferred $32,000 from the LLC's TD Bank account to their personal checking account, also at TD Bank (account ending in 4536).  Ex 219 at Walden000004 and Walden000054.  The Matoses then deposited $30,000 of those proceeds into the LLC's Walden account (ending in 8291) to which they never gave me access.  To date, the Matoses have not accounted for the $2,000 difference.  I understand that the Matoses used about $19,000 of the $30,000 to pay New York State taxes for the LLC, but most of these funds remain unaccounted for.

39.     On January 5, 2018, I pleaded with the Matoses to account for the substantial sums that they withdrew from company accounts in November and December 2017.  Ex. 31.  Tom promised to deliver an accounting but never did.  Instead, the Matoses continued to withdraw LLC funds, and on February 2, 2018, withdrew $5,906.45 in cash from the Walden Account (8291).  Ex. 219 at Walden000017.

40.     In sum, from November 28, 2017, through March of 2018, the Matoses diverted over $66,000 from LLC accounts and to their own accounts or accounts that only they controlled.

41.     *Second*, the Matoses began driving a wedge between my wife and I.  While I was in a coma and hospitalized, the Matoses cajoled my wife, Jade, into hiding my computer from me and taking possession of all passwords and bank account login information.  Tom then told my wife to "cut your ties as completely as possible and let the lawyers figure out how much money they can get from him for you."  Ex. 32 at Holland005499.  At the same time, Tom was assuring me that he remained loyal and was looking out for my best interests.

42.     During this period, my wife and I separated and she moved to Canada with the children.  Because of our close relationship, the Matoses were aware that my wife suffers from psychosis, a mental illness characterized by hallucinations and delusions.  They began planting

10

false ideas in her head about me. On January 7, 2018, Tom tried to persuade Jade that I might murder her and our children:

> If you really think he's capable of suicide the what's the say he's not capable of killing you on those two boys. I hate to say that but I have to think about that. I am not trying to scare you I'm trying to make you see that it works both ways if you believe he's capable of committing suicide Essentially are saying you know that he's capable of anything.

43. Tom also urged Jade to file a baseless report with Canadian Child Services saying she feared I may sexually abuse our children. At the same time, the Matoses offered me feigned emotional support and assured me that I need not worry about business because the store was in their "good hands."

44. *Third*, the Matoses took steps to form their own business using my customer database, inventory, and goodwill. On January 15, 2018, at Tom's request, Amy Holland, my sister and employee, sent Tom the file containing our confidential database of over 200,000 online customers of Ministry Ideaz (Ecuador). Exs. 37 and 61.

45. On January 29, 2018, without telling me, the Matoses formed a new company called BestLife Gifts, LLC, and listed Ministry Ideaz's Pine Bush address as the legal address of this new entity. Ex. 34. On March 1, 2018, also without telling me, the Matoses removed Ministry Ideaz's sign from the Pine Bush store. As Tom wrote in a text message to Katherine Moeckel:

> that out. In the meantime we've got a new sign up and I still haven't had the hard talk with Greg yet.

Ex. 36.

46. Without warning, on March 2, 2018, Tom sent me the following message by email:

11

> [W]e are severing ties!…The store sign has been removed, the lease has ended, utilities, phones and internet canceled and all Clovers shut down.…
> Bear in mind that the store is gone, our conversation must focus on division of assets and moving forward.

Ex. 35.

47. As an attachment to his e-mail, Tom provided a copy of a "Special Meeting" of Ministry Ideaz LLC purportedly held on March 2, 2018 at the Matoses' home in Pine Bush. I was not notified of this "Special Meeting" and did not attend. According to the document they provided, at the Special Meeting conducted without my knowledge, Tom and Nanci approved the following resolutions:

> Payment of Quarterly Sales Tax;
> Disconnect [sic] of utilities;
> Terminate "Ministry Ideaz LLC" lease;
> Dissolution of Ministry Ideaz LLC; and
> Storage of Ministry Ideaz assets.

Ex. 35.

48. By that time, Tom had obtained not only my entire customer database, but also confidential medical records from my hospitalization in Ecuador. (Exs. 37, 39 and 61.) With this information in hand, Tom called me on March 5, 2018. In retrospect, I believe Tom intentionally chose March 5 because he knew it was our wedding anniversary and that I would be especially distraught and vulnerable on that particular day. Tom told me that I should accept as a given that I had already lost the Pine Bush store permanently, and he threatened that if I did not accept his demands, he would make sure that I also lost my online business. Tom said he would contact the over 200,000 Ministry Ideaz (Ecuador) customers in the database that he had obtained, and would disclose embarrassing personal information.

49. Tom also threatened to immediately stop delivering Ministry Ideaz (Ecuador)'s online orders to the post office. At that time, the Matoses were sitting on approximately one

thousand packages from Ecuador, which the they had received in Pine Bush and were supposed to drop off at the post office for delivery to customers who had placed online orders. Failing to deliver these orders would have ruined my credibility and goodwill with these customers. Even worse, Tom's threat, if carried out, would have devastated my entire online business because there was no way I could, with such short notice, find a new arrangement to deliver the approximately 500-1000 orders per week that Ministry Ideaz Ecuador was routing through Pine Bush.

50. Tom offered that if I signed over my interest in Ministry Ideaz and the inventory on site, the Matoses would refrain from following through on their threat to contact my 200,000 customers, and would continue to process orders for Ministry Ideaz (Ecuador) orders through the end of 2018. At that time, the Ministry Ideaz (Ecuador) inventory in Pine Bush awaiting delivery to the USPS was worth as least $80,000. I felt I had no choice but to accept.

51. On March 5, 2018, I signed a one-page "agreement" drafted by Tom, stating:

> It is agreed that Ministry ldeaz LLC is dissolved.
>
> Regarding the office equipment and existing Ministry ldeaz LLC inventory Greg Holland agrees to transfer his portion of ownership to Thomas Matos and Nanci Matos.
>
> In return Thomas and Nanci Matos agree to accept and process Ministry ldeaz online sales packages for a period of time ending on Dec. 31st 2018.
>
> It is also agreed that as further compensation for existing inventory Thomas and Nanci Matos will also accept, process and deposit return checks for Ministry ldeaz into an existing TD Bank account accessible Greg Holland. [*sic*]
>
> Thomas and Nanci Matos also agree to direct any incoming calls searching for Ministry ldeaz Online business to 1-877-446-0784.
>
> As of the signing of this agreement any money entering the said TD account will be the sole possession of Greg Holland and Ministry Ideaz.

Ex. 41.

13

52. The Matoses then rebranded the Pine Bush store as BestLife Gifts and began selling the LLC's remaining inventory. Exhibit 190 is a true and correct copy of a record I downloaded from the LLC's Clover account showing all inventory on hand as of March 6, 2018, which the Matoses kept for their new business. As reflected in Ex. 190, the total retail value of this inventory is $535,231.02, and the total wholesale value is $158,225.82.

53. According to the Matoses' records, BestLife Gifts shared the same success as Ministry Ideaz LLC. From March 5, 2018, through December 31, 2018, BestLife Gifts had $404,010.20 in gross in-store sales, including $121,486.75 in cash sales, with the additional $126,660.80 from online sales. Ex. 25 at MATOS_008180; Ex. 236. In 2019, BestLife Gifts had in store sales of $530,723.43, of which $146,399.85 were cash receipts. Ex. 237. PayPal records show that BestLife Gifts sold at least $17,878 to customers in my database.

54. In addition, the Matoses did not comply with the March 5, 2008 "agreement" because they failed to process my online orders and returns through the end of 2018. In fact, shortly after signing the March 5 agreement, they closed the LLC's PO Box, making it impossible for us to continue shipping. I had to scramble to make alternative arrangements.

55. Contrary to the Matoses' assertions, we continued to do a brisk online business after my disfellowshipping, which had no discernible effect on sales. Our faith prohibits socializing but not retail business transactions with a disfellowshipped member. We received only a handful of inquiries about the matter from our customers, and almost all of them chose to continue purchasing from us.

[Remainder of Page Intentionally Left Blank]

15

I declare under penalties of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 5, 2022 in Victoria, B.C., Canada.

*[signature: G Holland]*

_____

Greg Holland